UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Albany Apartments Tenants' Association, Melanie A. Doll, Trevor Zimmerman, Kristen Pendzimas, Angela Ramsey, Nicole Gilsrud, Diane Pendzimas, Julio Cesar de Dios, Jose Cardenas Romero, Patricio Guzman, and Ray Kranz, Jr.,

Plaintiffs,

v.

Civ. No. 01-1976 (JEL/RLE)
ORDER

Ann Veneman, in her official capacity as Secretary of the United States Department of Agriculture, and Infinity Holdahl-Albany LLC,

Defendants.

---

Timothy Thompson, Esq., John Cann, Esq., and Christine R. Goepfert, Esq., appeared for Plaintiffs Melanie A. Doll, Trevor Zimmerman, Kristen Pendzimas, Angela Ramsey, Nicole Gilsrud, Diane Pendzimas, Julio Cesar de Dios, Jose Cardenas Romero, Patricio Guzman, and Ray Kranz, Jr.

Friedrich A. P. Siekert, Esq., and Jackie J. Morris, Esq., Assistant United States Attorneys, Office of the United States Attorney for the District of Minnesota, appeared for Defendant Ann Veneman, in her official capacity as Secretary of the United States Department of Agriculture.

Thomas F. DeVincke, Esq., Bonner & Borhart LLP, appeared for Defendant Infinity Holdahl-Albany LLC.

---

This is an action by 10 tenants who reside in an apartment building located in central Minnesota.[1] From 1977 to 2001, the owner of the building received rental assistance payments and other benefits from the federal government under a rural rental housing program (Program) administered by the United States Department of Agriculture (DOA). *See* 42 U.S.C. §§ 1485,

[1] Albany Apartments Tenants' Association is also listed as a plaintiff in the case caption. However, the parties agree that the association has not been active since this litigation was commenced, and that it is no longer a party to this action.



FILED MAR 11 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED MAR 11 2003
DEPUTY CLERK'S INITIALS

1490a (2000). In April 2001, the DOA released the owner from the Program without imposing restrictive-use provisions protecting the tenants from, among other things, future rent increases. The same month, the owner sold the building to Infinity-Holdahl Albany LLC (Infinity). After Infinity increased rent charges, Plaintiffs brought this action against the Secretary of the DOA under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2000) (APA). Plaintiffs also allege that Infinity violated 42 U.S.C. § 1472(c) (2000). The matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment, the DOA's Motion to Dismiss or for Summary Judgment, and Infinity's Motion for Judgment on the Pleadings. For the reasons given below, the Court denies Plaintiffs' motion and grants the DOA's and Infinity's motions.

## I. BACKGROUND

Albany Apartments is a 24-unit apartment building located in Albany, Minnesota. (Goodnough Dec. ¶ 5.) The building was developed and constructed by a Minnesota partnership, DeWolf Apartments (DeWolf), in the late 1970s. (*See id.*) DeWolf financed the project by obtaining a loan of $402,100 from the Farmers Home Administration (FmHA), a division of the DOA. (*Id.*) The FmHA made the loan pursuant to section 515 of the Housing Act of 1949, codified as amended at 42 U.S.C. § 1485 (Section 515), which authorizes the DOA to finance rural rental housing for elderly and low- and moderate-income families and individuals. (*See* Goodnough Dec. ¶ 5.) DeWolf also received credits that reduced the effective interest rate on the loan to 1% and rental assistance payments on behalf of low-income tenants pursuant to section 521 of the Housing Act of 1949, codified as amended at 42 U.S.C. § 1490a (Section 521). (*See* Goodnough Dec. Ex. B.) In exchange for these benefits, DeWolf agreed, *inter alia*,

to maintain Albany Apartments as affordable rental housing and to limit the return on its investment in the project. (*See id.* Exs. A-C.)

DeWolf and the FmHA executed a promissory note and a real estate mortgage on April 20, 1977. (*Id.* Exs. B-C.) The promissory note contained an acceleration clause granting the FmHA the option of declaring "all or any part of [the] indebtedness immediately due and payable" in the event of a default by DeWolf. (*Id.* Ex. B.) The real estate mortgage also addressed the FmHA's rights in the event of a default:

> SHOULD DEFAULT occur in the performance or discharge of any obligation in this instrument or secured by this instrument . . . the [FmHA], at its option, with or without notice, may: (a) declare the entire amount unpaid under the note and any indebtedness to the [FmHA] hereby secured immediately due and payable, . . . (d) foreclose this instrument as provided herein by law, and (e) enforce any and all other rights and remedies provided herein or by present or future law.

(*Id.* Ex. C ¶ 17.)

In September 1999, DeWolf came under the control of a new group of partners. (Goepfert Dec. Ex. 6; Goodnough Dec. ¶ 6.) The Rural Housing Service (RHS), the successor to the FmHA, experienced difficulty working with DeWolf's new partners. (Goodnough Dec. ¶ 7, Ex. D.) A problem-case report prepared by the RHS in February 2000 recommended "acceleration followed by possible foreclosure" based on DeWolf's failure to communicate with the RHS, to complete necessary paperwork, to make payments properly, and to work with the RHS to correct these problems. (*Id.* Ex. D.) The RHS met with DeWolf in April 2000 to discuss the report. (*Id.*) At the meeting, the RHS and DeWolf agreed to continue working together to avoid acceleration. (*Id.*) The situation did not improve, however, and in May 2000, DeWolf stopped making payments altogether. (*Id.* ¶ 8, Ex. E.) In October 2000, RHS prepared a second problem-case report recommending "acceleration followed by possible foreclosure." (*Id.* Ex. E.)

The October report noted, "it is possible that [DeWolf] is forcing an acceleration to circumvent the prepayment process." (*Id.*)

In January 2001, the RHS sent DeWolf a notice of acceleration declaring the entire debt due immediately. (*Id.* ¶ 9, Ex. F.) In response to the notice, DeWolf paid the debt of approximately $185,000 on April 10, 2001. (*Id.* ¶ 9.) On the same day, DeWolf conveyed its interest in Albany Apartments to Infinity. (Goepfert Dec. Ex. 11.) The RHS and DeWolf undertook several "Tenant Protection Actions" in connection with DeWolf's release from the Program, including: (1) offering eligible tenants a priority position on waiting lists at other housing projects financed by the RHS; (2) notifying low-income tenants that their rental assistance payments could be assigned to another housing project; (3) providing tenants with a list of other housing projects in the area; and (4) extending the term of tenants' leases for 180 days. (*Id.* ¶ 10.)

Of the 10 tenants who brought this action, four—Melanie Doll, Trevor Zimmerman, Kristen Pendzimas, and Angela Ramsey—lived in Albany Apartments while it was participating in the Program. (Kodluboy Dec. ¶ 5.) Infinity increased rent charges for these tenants on October 1, 2001. (*Id.* ¶¶ 4-5; Goepfert Dec. ¶ 5.) Doll's rent was increased from $286 per month to $425 per month, and the other tenants' rent was increased from $301 per month to $425 per month. (Kodluboy Dec. ¶ 5.) The six remaining tenants—Nicole Gilsrud, Diane Pendzimas, Julio Cesar de Dios, Jose Cardenas Romero, Patricio Guzman, and Roy Kranz, Jr.—moved into Albany Apartments after it was released from the Program, and have been charged $425 per month for rent since they moved in. (Compl. ¶¶ 11-15; *see* Kodluboy Dec. ¶ 5.)

## II. DISCUSSION

### A. Standard of Decision

There are three motions before the Court: (1) Plaintiffs' Motion for Partial Summary Judgment; (2) the DOA's Motion to Dismiss or for Summary Judgment; and (3) Infinity's Motion for Judgment on the Pleadings. Because the parties have presented matters outside the pleadings that have not been excluded, the Court will treat all of the motions as motions for summary judgment under Fed. R. Civ. P. 56. *See id.* 12(b)-(c).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c). A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When the record taken as a whole could not lead a rational trier of fact to find for the party opposing the motion, there is no "genuine issue for trial." *Id.* In determining whether summary judgment is appropriate, a court must view the evidence in the record and the inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**B. Sovereign Immunity**

The DOA contends that Plaintiffs' claims against it are barred under the doctrine of sovereign immunity. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). In a 1976 amendment to the APA, the federal government waived its sovereign immunity from suits seeking relief other than money damages. 5 U.S.C. § 702. Section 702 provides in pertinent part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

The exception for actions seeking money damages does not apply in this case because, although Plaintiffs seek money damages from Infinity, they seek only injunctive and declaratory relief against the DOA.

The APA's judicial review provisions, including section 702's waiver of sovereign immunity, do not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Relying on the Supreme Court's interpretation of section 701(a)(2) in *Heckler v. Chaney*, 470 U.S. 821 (1985), the DOA argues that it is immune from Plaintiffs' claims. *Heckler* involved a challenge to the Food and Drug Administration's decision not to undertake enforcement action against the use of certain drugs in the administration of the death penalty. *Id.* at 823. The Court held that an agency's decision not to take enforcement action is "committed to agency discretion by law," and is therefore presumed immune from judicial review under section 701(a)(2). *Heckler*, 470 U.S. at 832. The DOA has failed to explain how the present case fits within the holding of *Heckler*. Plaintiffs claims are not based on the DOA's failure to exercise its enforcement power. The Court therefore rejects the DOA's

argument on this point, and concludes that the doctrine of sovereign immunity does not bar Plaintiffs' claims.

## C. Standing

The parties agree that the four tenants who resided in Albany Apartments prior to April 10, 2001, have standing to bring this action, but they disagree as to whether the remaining six tenants have standing. For ease of reference, the Court will call the former group of tenants the "Prerelease Tenants," and the latter group the "Postrelease Tenants."

"Though some [elements of standing doctrine] express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III" of the Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum of standing contains three elements." *Id.* First, the plaintiff must have suffered an "injury in fact," defined as an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Id.* Second, the injury must be fairly traceable to the challenged action of the defendant. *Id.* Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 561. The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.*

Infinity and the DOA argue that the Postrelease Tenants have failed to satisfy their burden. In response, the Postrelease Tenants argue that, because it is undisputed that the Prerelease Tenants have standing, the Court need not consider whether the Postrelease Tenants have standing. The standing of the Prerelease Tenants, they argue, "is sufficient to allow related claims of all other parties." (Plaints.' Reply Mem. & Mem. Opp. Defs.' Motions at 2.) In support of their position, the Postrelease Tenants rely on four cases: *Bowen v. Kendrick*, 487

U.S. 589 (1988); *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375 (1982); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977); and *National Wildlife Foundation v. Agricultural Stabilization & Conservation Service*, 955 F.2d 1199 (8th Cir. 1992).

Each of the cases cited by the Postrelease Tenants involved multiple plaintiffs asserting the same claims and seeking the same declaratory or injunctive relief. *See Bowen*, 487 U.S. at 593, 597 (multiple plaintiffs challenge constitutionality of federal grant program and seek declaratory and injunctive relief); *Gen. Bldg. Contractors Ass'n*, 458 U.S. at 378 (multiple plaintiffs challenge exclusive hiring hall and apprenticeship program as racially discriminatory and seek injunctive relief); *Arlington Heights*, 429 U.S. at 254, 258 (multiple plaintiffs challenge zoning decision and seek declaratory and injunctive relief); *Nat'l Wildlife Found.*, 955 F.2d at 1200 (multiple plaintiffs challenge federal government's authority to grant exemption from provision of Food Security Act of 1985). In such cases, the merits of the action do not depend on facts or circumstances unique to any particular plaintiff. Under these conditions, the presence of at least one plaintiff with standing makes it unnecessary to determine whether the remaining plaintiffs have standing because, as a practical matter, the court will have to address the merits of the claims *whether the remaining plaintiffs have standing or not*. In this case, then, the fact that the Prerelease Tenants have standing does not excuse the Postrelease Tenants from Article III's standing requirement. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-76 (1982) (stating "those who do not possess Art. III standing may not litigate as suitors in the courts of the United States"). Rather, it means only that, to the extent the Postrelease Tenants assert the same claims and seek the same relief as the Prerelease

Tenants, the Court can proceed to the merits of those claims without regard to whether the Postrelease Tenants have standing.

Thus, the issue becomes whether the Postrelease Tenants and the Prerelease Tenants assert the same claims and seek the same relief. The claims of both sets of tenants are identical. The relief they seek is generally the same, as well. For example, they all seek a declaratory judgment that Infinity and the DOA violated federal statutes in connection with DeWolf's release from the Program, and that a regulation promulgated by the DOA violates the APA and the Fifth Amendment. (Compl. ¶ 50(A)(1)-(7).) They all seek an injunction directing the DOA to impose, and Infinity to accept, restrictive-use provisions prohibiting Infinity from raising rents or evicting tenants. (*Id.* ¶ 50(B).) With respect to these claims for relief, it is unnecessary to decide whether the Postrelease Tenants have standing. There are two other types of relief mentioned in the Complaint, however, for which this shortcut is not available. First, the tenants seek a declaratory judgment that, as a result of the allegedly unlawful acts of Infinity and the DOA, they "have paid rent in excess of their legal obligation, in an amount to be determined." (*Id.* ¶ 50(A)(8).) Second, they ask for a judgment of money damages or equitable restitution against Infinity in an amount equal to the excess rent paid. (*Id.* ¶ 50(C).) Because the questions of whether and to what extent a tenant has paid excess rent cannot be answered without reference to the facts and circumstances unique to each tenant, the Postrelease Tenants must demonstrate that they have standing with respect to these claims for relief.

As outlined above, the Postrelease Tenants contend that have paid too much rent as a result of the DOA's failure to comply with federal statutes and to impose restrictions on Infinity's ability to raise rents. Based on the evidence in the record regarding the income of the Postrelease Tenants, it appears that if those restrictions had been in place, they would have been

eligible for reduced rent. (Kodluboy Dec. ¶¶ 3-6, Ex. 1.) These facts are sufficient to satisfy the injury and causation elements of the standing requirement. Furthermore, because a decision favorable to the Postrelease Tenants would require the DOA to impose the restrictive-use provisions, and would require Infinity to reimburse the Postrelease Tenants for excess rent paid, the redressability element is satisfied as well.

**D. Claims Against the DOA**

Plaintiffs' first claim is that the DOA violated 42 U.S.C. § 1472(c) when it allowed DeWolf to prepay its RHS loan in response to the notice of acceleration without imposing restrictive-use provisions to protect the tenants of Albany Apartments. It is undisputed, however, that the DOA's decision was consistent with a DOA regulation that addresses prepayments of Section 515 loans made in response to an acceleration. 7 C.F.R. § 1965.223(a) (2002). Section 1965.223(a) provides in pertinent part:

> Any FmHA or [RHS] loan made after December 21, 1979, prepaid in response to an acceleration of the account will be required to have the appropriate restrictive-use language inserted in the deed of release or satisfaction, as appropriate upon the advice of OGC [the Office of General Counsel]. *Any FmHA or [RHS] loan made on or before December 21, 1979, with payment-in-full made in response to an acceleration of the account, will be required to have the appropriate restrictive-use language inserted on the instrument recorded in the real estate records, as appropriate upon the advice of OGC, only if the payment occurs within 1 year after the borrower had initiated a request to prepay the loan(s).*

(Emphasis added.) The regulations define "prepayment" as a "loan which has been paid by the borrower in full, before the loan maturity date." 7 C.F.R. § 1965.202 (2002). They also set forth in some detail the steps that must be taken by a borrower who wishes to initiate a request to prepay a loan. *See id.* § 1965.205.

The loan at issue in this case was made on April 20, 1977, and had a maturity date of April 20, 2017. (Goodnough Dec. Exs. B-C.) DeWolf prepaid the loan in response to the RHS's

notice of acceleration on April 10, 2001. (*Id.* ¶ 9.) DeWolf had not initiated a request to prepay the loan within one year prior to April 10, 2001. (*Id.* ¶ 11.) Indeed, DeWolf did not initiate a request to prepay the loan at any time. (*Id.*) Thus, under section 1965.223(a), the DOA was not required to impose any restrictive-use provisions.

Given that the DOA's decision to allow DeWolf to prepay without imposing restrictive-use provisions was in accord with section 1965.223(a), Plaintiffs' claim that the DOA's *decision* violated 42 U.S.C. § 1472(c) is, at bottom, a claim that the DOA's *regulation* is inconsistent with that statute. A court reviewing an agency's construction of a statute it administers is confronted with two questions. *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). The first is whether the statute "has directly spoken to the precise question at issue." *Id.* "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.

If, on the other hand, the court determines that the statute is "silent or ambiguous" with respect to the precise question at issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11. Rather, an agency's construction is impermissible only if it is unreasonable. *Id.* at 845 (framing issue as whether agency's construction "is a reasonable one"); *Sierra Club v. EPA*, 252 F.3d 943, 948 (8th Cir. 2001) (equating "permissible" with "reasonable"); *Ark. AFL-CIO v. FCC*, 11 F.3d 1430, 1441 (8th Cir. 1993) ("In order to be 'permissible,' the agency's construction of the statute must be reasonable.").

Applying the *Chevron* framework, the Court will begin by examining the language of section 1472(c). Section 1472(c) provides that within 30 days of "receiving an *offer to prepay*" a Section 515 loan, the DOA must give written notice of the offer to, among others, the tenants of the housing project. *Id.* § 1472(c)(3) (emphasis added). The DOA generally "may not accept an *offer to prepay*" a Section 515 loan entered between December 21, 1979, and December 15, 1989, unless it takes "appropriate action" obligating the borrower and the borrower's successors in interest to continue to operate the project as affordable housing for elderly, handicapped, and low- and moderate-income families and persons. *Id.* § 1472(c)(1)(A) (emphasis added). The DOA "may not accept an *offer to prepay*" a Section 515 loan entered on or after December 15, 1989. *Id.* § 1472(c)(1)(B) (emphasis added).

"Before accepting any *offer to prepay*" a Section 515 loan entered before December 15, 1989, the DOA must make reasonable efforts to reach an agreement with the borrower to extend the low-income use of the housing project for at least 20 years. *Id.* § 1472(c)(4)(A) (emphasis added). The DOA is authorized to offer various incentives to entice the borrower to enter such an agreement. *Id.* § 1472(c)(4)(B)-(C).

If the DOA determines after a reasonable period of time that it cannot reach an agreement with the borrower, it must require the borrower to offer to sell the housing project to qualified nonprofit organizations and public agencies. *Id.* § 1472(c)(5)(A)(i). If no qualified nonprofit organization or public agency makes a bona fide offer to purchase the project within 180 days, the DOA "may accept the *offer to prepay*." *Id.* § 1472(c)(5)(A)(ii) (emphasis added). There are two exceptions to the requirement that the borrower offer the project for sale. *Id.* § 1472(c)(5)(G) (providing two situations in which the requirement "shall not apply to any *offer to prepay*" a loan made before December 15, 1989) (emphasis added). The first exception applies

when the borrower agrees to continue to utilize the project as affordable housing for elderly, handicapped, and moderate- and low-income individuals for a specified period, and to offer to sell the project to a qualified nonprofit organization or public agency when the period ends. *Id.* § 1472(c)(5)(G)(i). The second exception applies when the DOA determines that: (1) housing opportunities of minorities will not be materially affected as a result of the prepayment, *id.* § 1472(c)(5)(G)(ii), and (2) the borrower and the borrower's successors in interest are obligated to ensure that tenants of the project will not be displaced because of a change in the use of the project or an increase in rental or other charges, *id.* § 1472(c)(5)(G)(ii)(I), or (3) there is an adequate supply of safe, decent, and affordable rental housing within the market area of the project, and sufficient actions have been taken to ensure that the rental housing will be made available to each tenant if they are displaced, *id.* § 1472(c)(5)(G)(ii)(II).

It is apparent from this tour of the statutory language that section 1472(c) addresses the duties of the DOA when a borrower makes an "offer to prepay" a Section 515 loan. The question whether the DOA should have followed the commands of section 1472(c) in this case turns, then, on whether a prepayment in response to a notice of acceleration constitutes an "offer to prepay." The statute itself does not expressly define the phrase "offer to prepay." There is a strong argument, however, that by using the word "offer," Congress unambiguously excluded prepayments in response to acceleration. An offer does not give rise to an obligation absent acceptance by the party to whom the offer is made. Applying this principle to the present context, a borrower making an offer to prepay a loan would be under no obligation to prepay unless the offer was accepted by the lender. In contrast, when a borrower defaults and the lender

accelerates the loan, the borrower becomes obligated to pay the outstanding debt immediately.[2] A borrower who expresses a willingness to prepay a loan in response to acceleration is not making an "offer" to prepay the loan, as that term is commonly understood, because the borrower is already obligated to do so. In sum, Congress's use of the word "offer" strongly suggests that it did not intend section 1472(c) to apply to prepayments in response to acceleration.[3]

The DOA's construction of the statute is consistent with this suggestion. In its regulations, the DOA construes the phrase "offer to prepay" to refer to a written request initiated by a borrower to pay a loan in full before its maturity date. *See* 7 C.F.R. §§ 1965.202-.219. Borrowers making such a request must submit the following to the DOA: (1) a request to prepay the loan on a specific date at least 180 days in the future; (2) information that allows the DOA to prepare a prepayment report and an offer of incentives; (3) documents concerning the borrower's ability to prepay under the conditions specified in the request; (4) certification that the housing project will continue to be used in accordance with the policies of the Fair Housing Act; (5) if the borrower wishes to prepay subject to restrictive-use provisions, a statement accepting the provisions; and (6) evidence that any applicable State law requirements related to prepayment have been met. *Id.* § 1965.205(c). Under the DOA's construction of the statute, a borrower who

---

2 For example, the opening paragraph of the notice of acceleration received by DeWolf stated: "PLEASE TAKE NOTE that the entire indebtedness due on the promissory note which evidence[s] the loan received by you from the United States of America, acting through the [RHS, DOA], is now declared immediately due and payable." (Goodnough Dec. Ex. F.)

3 When the language of a statute strongly suggests an answer to the precise question at issue, and the agency's construction of the statute is entirely consistent with that answer, it makes little difference whether a court concludes at step one of the *Chevron* analysis that the statute unambiguously provides the answer, or concludes at step two that the agency's construction is permissible and entitled to deference. Regardless of the route taken, the result will be the same.

tenders payment in response to a notice of acceleration has not made an "offer to prepay." Based on the foregoing discussion regarding the basic difference between an offer to prepay a loan and a prepayment made in response to acceleration, the Court concludes that the DOA's construction is reasonable. From this conclusion, it follows that the DOA's treatment of DeWolf's prepayment did not violate section 1472(c).

The Court will next address Plaintiffs' claims that 7 C.F.R. § 1965.223(a) must be set aside because its treatment of prepayments of loans made on or before December 21, 1979, is "arbitrary" and "capricious," *see* 5 U.S.C. § 706(2)(a), and violates the equal protection component of the Fifth Amendment's Due Process Clause.[4] Again, under section 1965.223(a), when a borrower prepays a loan made after December 21, 1979, the DOA imposes restrictive-use provisions "as appropriate upon the advice of OGC." When a borrower prepays a loan made on or before December 21, 1979, the DOA imposes such provisions "only if the payment occurs within 1 year after the borrower had initiated a request to prepay the loan(s)." *Id.* Plaintiffs challenge two distinctions drawn by section 1965.223(a): (1) the distinction between loans made on or before December 21, 1979, and those made after that date; and (2) the distinction between prepayments of loans made on or before December 21, 1979, that do not occur within one year after the borrower initiates a request to prepay, and prepayments of such loans that do occur within one year after the borrower initiates a request to prepay.

The parties agree that Plaintiffs' equal protection challenge is subject to the rational basis standard of review. In applying the rational basis standard, the Court presumes that the regulation is valid and will sustain it so long as the classification drawn by the regulation is

---

[4] The Due Process Clause of the Fifth Amendment has been interpreted to impose requirements on the federal government comparable to those the Equal Protection Clause of the Fourteenth Amendment imposes on the States. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 542 n.2 (1983); *Schweiker v. Wilson*, 450 U.S. 221, 226 n.6 (1981).

rationally related to a legitimate governmental interest. *See United States v. Smith*, 171 F.3d 617, 624 (8th Cir. 1999); *Red River Serv. Corp. v. City of Minot*, 146 F.3d 583, 590 (8th Cir. 1998). As the party challenging the classification, Plaintiffs have the burden of proving that it is wholly arbitrary and irrational, and that it cannot conceivably further a legitimate governmental interest. *Smith*, 171 F.3d at 624; *Red River*, 146 F.3d at 590.

Plaintiffs have failed to carry their burden. Section 1965.223(a)'s distinction between loans made on or before December 21, 1979, and those made after December 21, 1979, is a product of the history of Congress's efforts in the area of restrictive-use provisions and offers to prepay. Until 1979, borrowers enjoyed an unfettered right to prepay Section 515 loans. In 1979, Congress found that many borrowers were prepaying their loans and exiting the Program, thereby threatening the continuing availability of affordable rural housing. *Franconia Assocs. v. United States*, 122 S. Ct. 1993, 1998 (2002). Congress responded to this problem by enacting section 1472(c) as part of the Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, § 503(b), 93 Stat. 1101 (1979). The effective date of the 1979 amendments was, as one can probably guess, December 21, 1979.

As originally enacted, section 1472(c) applied to an offer to prepay any Section 515 loan, whether the loan was made before or after December 21, 1979. Significantly, the 1979 act also required "the instruments under which the loan is made and the security given" to contain provisions specifying that "any prepayment" of a loan would be subject to section 1472(c). Pub. L. No. 96-153, § 503(a), 93 Stat. 1101 (1979) (codified at 42 U.S.C. § 1472(b)(2) (2000)). In effect, this requirement ensured that any borrower who received a Section 515 loan after December 21, 1979, would be on notice that their right to prepay was subject to restrictions.

Section 515 loan documents executed on or before December 21, 1979, did not contain such provisions.

Congress made significant changes to section 1472(c) in 1980, 1988, 1989, and 1992, *see Franconia*, 122 S. Ct. at 1998-99 (tracing history of section 1472(c)); Rural Rental Housing Displacement Prevention, 58 Fed. Reg. 38,913, 38,913-15 (July 21, 1993) (same), and many of those changes addressed the thorny issue of whether section 1472(c) should apply retroactively. The important point for purposes of this discussion is that borrowers who obtained Section 515 loans on or before December 21, 1979, did so with the expectation, supported by the loan documents they executed, that they would be able to prepay the loan and exit the Program without restrictions. When the DOA applies section 1472(c) retroactively, the expectations of the borrowers are frustrated. On several occasions, the DOA's retroactive application of section 1472(c) has led the borrower to bring an action against the government. *See, e.g.*, *Franconia*, 122 S. Ct. at 1999-2000; *Parkridge Investors Ltd. P'ship ex rel. Mortimer v. Farmers Home Admin.*, 13 F.3d 1192 (8th Cir. 1994); *Lifgren v. Yuetter*, 767 F. Supp. 1473 (D. Minn. 1991).

When viewed against this background, it is clear that section 1965.223(a)'s distinction between loans made on or before December 21, 1979, and those made after that date is rationally related to a legitimate government interest. The DOA's legitimate interest can be conceptualized in any of a number of ways—an interest in honoring the terms of its contracts, an interest in ensuring that it does not frustrate the expectations of those with whom it does business. The distinction is rationally related to this objective in that it generally allows the DOA to impose restrictive-use provisions only when a borrower makes a prepayment in response to acceleration of a post-December 21, 1979, loan, where concerns regarding retroactivity are absent.

Section 1965.223(a)'s distinction between prepayments of loans made on or before December 21, 1979, that do not occur within one year after the borrower initiations a request to prepay (which are not subject to restrictive-use provision) and prepayments of such loans that do occur within one year of a request to prepay (which are subject to restrictive-use provisions "as appropriate upon the advice of OGC") also survives rational basis review. The DOA described its basis for this distinction in comments published in the Federal Register:

> There have been comments from tenant advocacy groups that borrowers who received loans prior to December 21, 1979, may intentionally default on their loans in order to circumvent the prepayment process and the regulations [relating to offers to prepay]. Specifically, borrowers who wish to prepay and not be subjected to required restrictive-use provisions may purposefully default and pay their loan(s) in full in response to an acceleration of the defaulted loan by [the DOA]. In order to prevent purposeful circumvention such as this, the regulations . . . require that any loan made on or before December 21, 1979, paid-in-full in response to an acceleration of the account, would be made subject to restrictive-use provisions if the borrower had initiated a prepayment request on the loan anytime within a year prior to the payment-in-full.

Rural Rental Housing Displacement Prevention, 58 Fed. Reg. at 38,921.

The Court has already made reference to Congress's concern about the impact of loan prepayments on the supply of affordable rural housing, and Plaintiffs do not quarrel with the notion that the DOA has a legitimate interest in preventing borrowers from dodging restrictive-use provisions by provoking acceleration. The regulation's standard for identifying borrowers who are purposefully defaulting on their loans may be imprecise—indeed, the facts of the present case make it easy to imagine a situation in which a borrower purposefully defaults without first initiating a request to prepay—but it is not irrational. The fact that a default occurs shortly after an unsuccessful request to prepay could indicate that the borrower is provoking acceleration.

In sum, the Court concludes that Plaintiffs have failed to establish that either of the challenged distinctions violate the equal protection component of the Fifth Amendment's Due Process Clause. Likewise, the Court has no basis for concluding that either of the distinctions should be set aside under the APA as "arbitrary" or "capricious."

Plaintiffs' final claims against the DOA are that its regulations violate 42 U.S.C. §§ 1471(g), 3608(d) (2000). Section 1471(g) provides that "[t]he [farm housing] programs authorized by [42 U.S.C. §§ 1471-1490s] shall be carried out, consistent with program goals and objectives, so that the involuntary displacement of families and businesses is avoided." Section 3608(d) provides:

> All executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal agency having regulatory or supervisory authority over financial institutions) in a manner affirmatively to further the [fair housing] purposes of [42 U.S.C. §§ 3601-3619] and shall cooperate with the Secretary [of the United States Department of Housing and Urban Development] to further such purposes.

This provision establishes an affirmative duty to take action that directly results in "the implementation of the dual and mutual goals of fair housing and the elimination of discrimination in that housing." *Clients' Council v. Pierce*, 711 F.2d 1406, 1425 (8th Cir. 1983); *Little Earth of United Tribes v. HUD*, 675 F. Supp. 497, 534 (D. Minn. 1987) (quoting *Pierce*).

Plaintiffs have not come close to establishing that the DOA's administration of the Program violates either of these statutes. In support of their claims, Plaintiffs speculate that section 1965.223(a) "will likely lead to displacement for at least some" tenants (Plaints.' Mem. Supp. Part. Summ. J. at 22), and "is bound to have an adverse impact on minority tenants" (*id.* at 24). In essence, Plaintiffs view section 1471(g) as a prohibition on any agency action that could possibly result in the displacement of a tenant, and they view section 3608(d) as a prohibition on any action that could possibly have an adverse impact on minority tenants. The language of the

statutes does not support this construction. Both statutes leave agencies with broad discretion in deciding which policies will best further the objectives of the programs established by Congress. As discussed, section 1965.223(a) represents a balanced approach to the complex issues and policy choices—including avoiding retroactivity, maintaining the supply of affordable rural housing, and preventing borrowers from circumventing the prepayment request process by inviting acceleration—that arise when a borrower prepays a Section 515 loan in response to a notice of acceleration. The Court grants the DOA's motion for summary judgment on these claims.

### E. Claims Against Infinity

Plaintiffs' Complaint sets forth two claims against Infinity. The first claim is that Infinity violated 42 U.S.C. § 1472(c) by "defaulting on its obligations so as to provoke [the] RHS into accelerating the [loan]." (Compl. ¶ 48.) This claim is entirely without merit. The only loan at issue in this case was between the RHS and *DeWolf*, not Infinity. The Court therefore concludes that Infinity is entitled to summary judgment on this claim.

Plaintiffs' second claim is that Infinity violated 42 U.S.C. § 1472(c) "by seeking to benefit from a . . . prepayment which did not comply with federal law, and from the actions of [the DOA] in permitting [the] prepayment." (Compl. ¶ 49.) Plaintiffs' theory appears to be that, because the DOA should have imposed restrictive-use provisions pursuant to section 1472(c) when DeWolf prepaid its loan, and because those provisions would have protected the tenants of Albany Apartments from future rent increases, Infinity violated section 1472(c) when it increased rent charges. The Court has already concluded, however, that the manner in which the DOA handled DeWolf's prepayment did not violate section 1472(c) or any other provision of federal law. Thus, Infinity is entitled to summary judgment on this claim, as well.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiff Albany Apartments Tenants' Association is DISMISSED from this action by the consent of the parties.

2. Plaintiffs' Motion for Partial Summary Judgment [Docket No. 18] is DENIED.

3. Defendant DOA's Motion to Dismiss or for Summary Judgment [Docket No. 22] is GRANTED.

4. Defendant Infinity's Motion for Judgment on the Pleadings [Docket No. 15] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 11, 2003

JOAN ERICKSEN LANCASTER
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*